**Katharine Edwards, OSB No. 173393**
attorney@kedwards-law.com
**LAW OFFICE OF KATHARINE EDWARDS, LLC**
P.O. Box 417
Hillsboro, Oregon 97123
Telephone: (503) 908-3589
Facsimile: (503) 241-2249

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **DARREN CARMICHAEL,** | Case No. |
| Plaintiff, | (42 U.S.C. §1983; negligence) |
| v. | |
| **STATE OF OREGON, OREGON DEPARTMENT OF CORRECTIONS, WARREN ROBERTS, JOSEPH BUGHER, ASHLEY CLEMENTS, HEIDI MILLER, MICHELE DAVIES, COREY FHUERE, DAVID PEDRO,** and **JAMIE MILLER,** | **COMPLAINT** JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Darren Carmichael alleges as follows:

### PRELIMINARY STATEMENT

1.     Plaintiff Darren Carmichael brings this action under 42 U.S.C. § 1983 against the named defendants for violation of the Eighth and Fourteenth Amendments to the United States Constitution by failing to provide adequate medical care while in custody of the Oregon Department of Corrections.

PAGE 1  – **COMPLAINT**

2.     Defendants repeatedly failed to properly address Plaintiff's chronic pain forcing Plaintiff to be subjected to debilitating pain and discomfort daily. Years after being abruptly removed from Gabapentin for effective pain relief, a provider-to-provider consult with a pain specialist was finally arranged. Defendants refused to follow the pain specialist's orders in a timely manner and shared incorrect medical history information with the specialist by omitting and misrepresenting important facts which inhibited Plaintiff's ability to receive healthcare tailored to his needs. On numerous occasions Plaintiff requested to speak with the pain specialist directly in order to remedy Defendants' inconsistencies about his health history but was denied the opportunity every time. During this period Plaintiff continued to seek assistance from medical staff who ignored his desperate pleas for help. Plaintiff accepted any medication made available to him which might alleviate his pain; however, when he reported harmful side effects or that certain medications had been ineffective in the past, Defendants disregarded his concerns. Throughout this time period Plaintiff also suffered from right shoulder pain and was only provided inconsistent steroid injections and ineffective physical therapy. An MRI and orthopedic consult were eventually approved but took months before Plaintiff was actually seen and by then Plaintiff learned that his rotator cuff was not only torn but had retracted due to the length of time the tear was allowed to remain untreated.  Additionally, Defendants have refused to treat Plaintiff's right knee even though Plaintiff has repeatedly informed Defendants that the knee requires surgical intervention. Over the years Plaintiff has complied with the Defendants and consistently communicated his concerns about his significant health issues and chronic pain, but Defendants have forced Plaintiff to suffer by denying and delaying medical care. Defendants' failure to provide adequate care for Plaintiff's health conditions have caused them to worsen substantially and potentially irreversibly.

3.      Plaintiff seeks declaratory and injunctive relief, an award of compensatory damages in an amount to be determined at trial and an award of reasonable attorney fees and costs under 42 U.S.C. § 1988.

4.      Plaintiff also alleges supplemental state law claims of negligence.

5.      Plaintiff is currently in the custody of Oregon Department of Corrections ("ODOC") at Oregon State Penitentiary ("OSP").

6.      Defendants are individuals who, during the time of Plaintiff's incarceration, have had authority and responsibility for his treatment, safety, custody, and care.

7.      Plaintiff has fully exhausted his available administrative remedies.

8.      Plaintiff filed a timely Tort Claim Notice.

9.      Plaintiff seeks equitable relief, compensatory and punitive damages, declaratory and injunctive relief, as well as attorney fees and costs as set forth below.

## JURISDICTION & VENUE

10.     Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, federal question jurisdiction, and pursuant to 28 U.S.C §1343(a)(3) and (4), civil rights jurisdiction.

11.     Venue is in the District of Oregon pursuant to 28 U.S.C. §1391(b) because the claim arose in this Judicial District and all Defendants are employed by ODOC, most recently at Oregon State Penitentiary, which is located in Marion County, Oregon.

## PARTIES

12.     Plaintiff Darren Carmichael is a citizen of the United States. At all times material, Plaintiff was incarcerated in the custody of ODOC at OSP in Marion County, Oregon, as well as Snake River Correctional Institution (SRCI) in Malheur County, Oregon, and Eastern Oregon Correctional Institution (EOCI) in Umatilla County, Oregon.

PAGE 3  – **COMPLAINT**

13.     Defendant State of Oregon operates the Oregon Department of Corrections (ODOC) which owns, staffs, and operates OSP.

14.     Defendant Warren Roberts is and was at all relevant times a medical doctor and Chief of Medicine at ODOC. Defendant Roberts is sued in his individual and official capacities.

15.     Defendant Joseph Bugher is and was at all relevant times the Director of Health Services at ODOC. Defendant Bugher is sued in his individual and official capacities.

16.     Defendant Ashley Clements is and was at all relevant times a nurse at SRCI. Defendant Clements is sued in her individual and official capacities.

17.     Defendant Heidi Miller upon information and belief is and was at all relevant times a nurse at OSP.  Defendant Miller is sued in her individual and official capacities.

18.     Defendant Michele Davies is and was at all relevant times a nurse at EOCI. Defendant Davies is sued in her individual and official capacities.

19.     Defendant Corey Fhuere is and was at all relevant times the superintendent of OSP. Defendant Fhuere is sued in his individual and official capacities.

20.     Defendant David Pedro is and was at all relevant times the superintendent of EOCI. Defendant Pedro is sued in his individual and official capacities.

21.     Defendant Jamie Miller is and was at all relevant times the superintendent of SRCI. Defendant Miller is sued in his individual and official capacities.

22.     At all times relevant, Defendant's employees, contractors, and supervisors, as their conduct is alleged herein, were acting within the course and scope of their employment with the defendant.

23.     All defendants are sued in their individual and official capacity.

## FACTUAL BACKGROUND

24.     Plaintiff has a significant history of injuries stemming from prior motorcycle accidents and a work-related injuries in the community. These injuries include, but are not limited to, cervical degenerative disc disease, brachial plexopathy, left ulnar neuropathy, right shoulder impingement, developing osteoarthritis at the glenohumeral joint in the right shoulder, loose body calcifications in his right knee, and a torn rotator cuff. Plaintiff has previously undergone multiple surgeries to address these health issues including two shoulder surgeries, spinal surgery, and pelvic surgery. As a result of these procedures, the plaintiff has hardware implanted in both the spine and pelvis. The previous surgical interventions did not adequately resolve Plaintiff's injuries and chronic pain as Plaintiff has experienced further health problems. Defendant has failed to properly address Plaintiff's serious health conditions which has left Plaintiff dangerously susceptible to further injury and suffering.

25.     Plaintiff entered ODOC custody in 2010.

26.     Plaintiff's health conditions and particular vulnerabilities are documented in ODOC's records.

27.     Plaintiff was prescribed 800mg of Gabapentin to be taken three times daily for pain management until Defendants abruptly stopped it in August 2019, despite the prescription being valid for another nine months.

28.     Upon information and belief, on May 9, 2018, Gabapentin was approved for non-formulary use to treat Plaintiff's pain and was approved again on or about April 4, 2019.

29.     Gabapentin had effectively managed Plaintiff's pain for years but after its abrupt discontinuation, Plaintiff experienced debilitating pain daily.

30.     Plaintiff filed a grievance dated September 26, 2019, regarding the sudden

removal of Gabapentin. In the grievance, Plaintiff described a meeting with Defendant Miller in

which he was told to try Cymbalta as a pain management alternative. Plaintiff also included

information on his two previous nerve conduction tests which confirmed permanent nerve

damage.

31.     Through his own research Plaintiff discovered that combining Cymbalta with

Effexor, a medication he was already taking for depression, could be dangerous. When Plaintiff

raised these concerns, Defendant Miller suggested switching the medications without ever

consulting Behavioral Health Services (BHS).

32.     In the grievance response, dated November 4, 2019, ODOC nurse S. Bailey wrote

that Gabapentin was discontinued because Plaintiff's "blood work indicated it was not at

therapeutic level." In Plaintiff's appeal, dated November 18, 2019, he provided research on how

Gabapentin levels can vary in the body and expressed disappointment for why any concern about

his lab work results was not previously been discussed with him.

33.     On or about December 4, 2019, the Provider's Returning Information form noted

that Plaintiff had made "minimal improvements to date despite good compliance with HEP

[Home Exercise Program]." Upon information and belief, the physical therapist suggested

alternative treatment for Plaintiff's chronic nerve pain.

34.     In Plaintiff's final appeal, dated February 27, 2020, Plaintiff emphasized that

since being incarcerated he had never abused drugs and stated, "I don't know why the lab test

showed lower levels but it sure wasn't because I wasn't taking my meds. I need this medication

it helps me so much you have no idea, it's like night and day." Additionally, Plaintiff noted that

Effexor, which is similar to Cymbalta, does not help his nerve pain and neither does physical

therapy. The response to Plaintiff's final appeal, dated May 7, 2020, and written by Defendant Bugher, referenced an evaluation with Defendant Roberts dated February 27, 2020, in which another nerve conduction test was recommended. Defendant Roberts did not recommend Gabapentin.

35.      Upon information and belief, the only pain management Plaintiff was provided at this time was physical therapy.

36.      Upon information and belief, Plaintiff did not see a neurologist for nerve pain until February 2020, which led to a third nerve conduction test being ordered in March 2020.

37.      Imaging on or about March 2, 2020, of Plaintiff's spine revealed "advanced mid-lower cervical spondylosis with significant interval progression."

38.      Imaging on or about September 16, 2020, of Plaintiff's right knee indicated "multiple calcifications at the tibial tuberosity."

39.      Upon information and belief Plaintiff underwent the nerve conduction test in November 2020, eight months after it was first ordered.

40.      On or about January 11, 2021, Plaintiff wrote a kyte to medical stating that permanent nerve damage was once again confirmed by the most recent nerve conduction test and reiterated his daily severe pain since losing access to Gabapentin.

41.      The years in which Gabapentin was inaccessible to Plaintiff forced him to needlessly suffer from unbearable pain, described like his arm and his hand was on "fire".

42.      On or about February 11, 2021, the Therapeutic Levels of Care Committee (TLC) denied surgical debridement for the calcifications and loose bodies found in Plaintiff's right knee, despite an orthopedic specialist diagnosis back in 2020 of patellar tendinitis coupled with confirmation of the presence of calcifications.

PAGE 7  – **COMPLAINT**

43.     On or about March 4, 2021, Plaintiff wrote a kyte to Defendant Miller pleading for something to manage his severe pain and stated, "I would like to try anything you think will help."

44.     On or about January 30, 2022, Plaintiff submitted a Non-Emergency Health Request indicating that he had been unable to see a provider for his pain since arriving at Eastern Oregon Correctional Institution (EOCI) in October 2021.

45.     Finally, on or about March 17, 2022, a referral was made to a pain management specialist for Plaintiff's chronic pain. On that same day, Dr. Holden, a medical provider at EOCI, noted that Plaintiff had tried various medications for his pain including Keppra, Meloxicam, and Effexor, all of which were ineffective. Dr. Holden also observed that Plaintiff's right knee was "enlarged (knotty) hard," requested a consult with a pain specialist, and recommended a trial of Baclofen.

46.     TLC denied Baclofen for pain management on or about March 22, 2022, but approved a physiatrist consult.

47.     On or about May 15, 2022, Plaintiff sent a kyte to medical inquiring as to when the physiatry appointment was taking place. The response stated, "TLC had to be rescheduled to 5/17 . . ." The following day, Plaintiff wrote another kyte to medical explaining that TLC had already approved a physiatrist video consult on March 22, 2022. The response to Plaintiff's kyte, dated May 18, 2022, stated, "the previous provider did not present your case for pain specialist – your chart is scheduled to go to the TLOC committee for the pain specialist. If approved that will be set in motion." The medical staff member's signature was illegible.

48.     On or about June 2, 2022, Plaintiff sent another kyte to medical Defendant Davies asking why the physiatrist video consult had not yet occurred. The next day, the response stated,

"nothing has been scheduled yet forwarding this to the proper people." The medical staff member's signature was illegible.

49.    On or about June 21, 2022, the TLC committee denied the physiatrist appointment for Plaintiff's chronic pain even though it was approved back in March of 2022. Instead, TLC recommended a provider appointment to complete "SNR [special needs request] form assessment."

50.    On or about July 11, 2022, Plaintiff saw his provider, Defendant Davies, and submitted a kyte to ensure she had all the health information necessary for the anticipated physiatry consult. Four days later Defendant Davies responded that a written order was made for a "provider-to-provider" consult.

51.    On or about July 19, 2022, Plaintiff sent another kyte to Defendant Davies to once again confirm defendant had all the necessary health history information for the provider-to-provider consult with Dr. Walker. This included the fact that he had undergone three separate nerve conduction tests since 2012 which indicated nerve damage relating to Plaintiff's brachial plexus injury along with ulnar nerve damage. Plaintiff also referenced the orthopedic specialist's surgical recommendation from 2020 for his right knee which had been denied by TLC. Plaintiff also reminded Defendant Davies about the recent X-ray imaging he had received.

52.    On or about July 19, 2022, Plaintiff's cervical spine imaging results revealed "advanced degenerative disease and hypertrophic endplate changes at C3-4, C4-5, C7-T1" and Plaintiff's right shoulder imaging results showed "developing osteoarthritic changes at the glenohumeral joint."

53.    On or about July 28, 2022, imaging of Plaintiff's right knee showed "multiple corticated ossifications proximal to the anterior tibial spine with overlying anterior soft tissue

fullness." The findings included "potential previous bony avulsions off of the anterior tibial spine with patellar tendon tendinosis."

54.    In a kyte to Defendant Davies on or about August 27, 2022, Plaintiff requested help for his pain in the interim while waiting for the physiatrist consult. Defendant Davies suggested, among other medications, Effexor/Venlafaxine and noted "I see multiple refusals of this medication. It needs to be taken voluntarily to be effective." Importantly, Dr. Holden had already noted back on March 17, 2022, that Plaintiff found Effexor/Venlafaxine to be ineffective. Plaintiff's response reiterated that Effexor/Venlafaxine did not alleviate his pain, stating, "I wish it did, but it doesn't." Defendant Davies also suggested Elavil, to which Plaintiff responded, "remember I told you I've been on it in the past and had weird side effects to it but I will absolutely try it again."

55.    On or about October 2, 2022, Plaintiff sent a kyte to medical and Defendant Davies asking why no progress had been made with the physiatrist and that the increase in NSAID medications was not working for his pain.

56.    Finally, on or about October 25, 2022, Defendant Davies met with Dr. Walker, the physiatrist. Dr. Walker's recommendations included a right shoulder steroid injection, various medications to address Plaintiff's pain and sleep issues, diagnostic testing for Plaintiff's neck and arm, imaging studies to evaluate Plaintiff's left arm and right knee, and monitoring of Plaintiff's pain symptoms.

57.    On or about November 4, 2022, Plaintiff sent a kyte to Defendant Davies inquiring about next steps following the physiatrist consult. The response had an unintelligible signature and stated, "you were seen today in medical." Plaintiff clarified that he was present at sick call for his acyclovir and did not see Defendant Davies that day.

58.     Plaintiff submitted a grievance dated November 13, 2022, after receiving the notes from Defendant Davies' consult with Dr. Walker. Plaintiff's grievance detailed how his medical history was gravely misrepresented because Defendant Davies failed to mention his two previous shoulder surgeries, the nerve damage from his brachial plexus injury, the three complete nerve conduction tests, and the 2020 recommendation for debridement surgery on his right knee by an orthopedic specialist. Additionally, Defendant Davies described the wrong arm when mentioning Plaintiff's muscle atrophy.

59.     On or about November 21, 2022, Plaintiff met with Defendant Davies to discuss the Dr. Walker consult and confirm a copy of Plaintiff's most recent nerve conduction test was faxed to Dr. Walker.

60.     Plaintiff received a grievance response from ODOC nurse R. Halladay on or about December 8, 2022, noting that after a trial of Dr. Walker's recommendations Plaintiff could request a face-to-face appointment from Defendant Davies.

61.     In his grievance appeal, Plaintiff highlighted that Defendant Davies only allowed a pain survey to be filled out for Plaintiff's neuropathy, despite his request to fill out multiple forms to reflect his multiple health conditions.

62.     Upon information and belief, Defendant Davies apologized to Plaintiff for incorrectly informing Dr. Walker that Plaintiff had a history of drug abuse and faxed the recent nerve conduction test results but did not provide any other additional information to Dr. Walker.

63.     On or about January 23, 2023, Dr. Walker made an addendum to his original notes dated October 27, 2022. In the addendum, Dr. Walker found that Plaintiff's PainDETECT score was a 23 and any score above 19 makes it likely that there is a "neuropathic component" to Plaintiff's pain. Dr. Walker observed a "visible difference" in Plaintiff's left "breast/pectoralis"

muscle compared to his right side. Dr. Walker, upon reviewing Plaintiff's neurology consult notes from 2014, recommended Gabapentin starting with 300mg twice daily and tapering up to 2400mg daily over the course of eight weeks. Additionally, Dr. Walker also advised monthly blood tests to ensure proper Gabapentin use. Lastly, Dr. Walker once again reiterated the need for a steroid injection in Plaintiff's right shoulder.

64.    On the same day, TLC nonetheless denied Gabapentin and approved an EMG (electromyography test).

65.    Additionally, Defendant Robert's responded to Plaintiff's appeal on or about January 23, 2023, explaining a care plan would be established and confirming that Dr. Walker received the most recent nerve conduction study and pain survey results.

66.    A physician's order dated January 31, 2023, and believed to be from Dr. Walker, noted that a Gabapentin recommendation should go to TLC. Once again, TLC denied the Gabapentin stating they were "awaiting more recent recommendations from Dr. Walker consult on 2/7/23."

67.    On or about February 1, 2023, Plaintiff's final appeal emphasized that three months had elapsed since the provider-to-provider consult between Defendant Davies and Dr. Walker. Defendant Bugher did not respond to the final appeal until on or about March 6, 2023, and supported the medical opinion of Defendant Dr. Roberts.

68.    On or about February 7, 2023, Dr. Walker referenced a "peer-to-peer" consultation in which he was made aware of Plaintiff's alleged "misuse/abuse of Gabapentin in the past." Dr. Walker recommended a 90-day trial of nortriptyline, desipramine, and duloxetine but stated that if the medications did not provide relief "it can be reasonable for [Plaintiff] to be trialed for 90 days of gabapentin." Dr. Walker also documented Plaintiff's side effects with

Amitriptyline which can have "anticholinergic effects, orthostatic hypotension, and cardiac effects."

69.     On or about March 5, 2023, Plaintiff sent a kyte to Defendant Davies pointing out that a year had passed since he was first approved to see a physiatrist, and nothing significant had changed with his chronic pain management.

70.     On or about March 12, 2023, Plaintiff sent a kyte to Defendant Davies stating that he was once again unable to urinate while taking a tricyclic medication, despite being instructed to continue to take it and only stop if he experienced a negative reaction. Plaintiff requested that his reaction be noted on his chart.

71.     Plaintiff endured an entire year hoping the physiatrist consult with Defendant Davies would provide the pain relief he desperately needed but instead Plaintiff dealt with continued delays. Plaintiff began requesting a face-to-face consult with Dr. Walker in order to explain his health conditions directly. Plaintiff's request was denied by TLC on or about March 21, 2023.

72.     On or about March 25, 2023, Plaintiff filed a grievance detailing the significant delays in care for his chronic pain and pointed out the insufficient information Defendant Davies shared with Dr. Walker. Although Dr. Walker was aware of Plaintiff's neurological pain, the other sources of pain were omitted.

73.     Plaintiff regularly communicated with Defendants that the insufficient information Dr. Walker received from Defendant Davies dangerously undermined the value of the pain specialist consultations and subsequent recommendations. Plaintiff's continued requests to speak with Dr. Walker were made for the purpose of remedying the inaccuracies in his file.

74.     On or about April 4, 2023, ODOC nurse Halladay responded to Plaintiff's grievance stating that a face-to-face consultation with Dr. Walker was not medically necessary at that time.

75.     Six months had passed since the initial consultation with Dr. Walker and no substantial efforts had been made to treat Plaintiff's pain.

76.     On or about May 1, 2023, Plaintiff signed a consent for a steroid injection to his right shoulder, seven months after it was first recommended by Dr. Walker.

77.     On or about May 9, 2023, TLC denied tramadol and instead recommended a re-evaluation after Plaintiff had been on an increased dose of Cymbalta for an "adequate" amount of time.

78.     In Plaintiff's final grievance appeal, dated May 29, 2023, he stated that "if I was in the community receiving the 'standard of care' I would be the one meeting with the pain specialist, not this 3rd party medical treatment I'm receiving." By this time, seven months had passed since the first consultation between Defendant Davies and Dr. Walker. Plaintiff had also recently learned that TLC had informed Dr. Walker incorrectly that Plaintiff had a history of misuse with Gabapentin.

79.     Upon information and belief, Plaintiff always took Gabapentin as prescribed, Plaintiff had not received Gabapentin since 2019, and Plaintiff was only removed from Gabapentin because of a single blood test result back in 2019.

80.     On or about July 9, 2023, Plaintiff sent a kyte to "Medical Provider" explaining that he had been on Cymbalta for three months, experienced no pain relief, and suffered from tremors in his left hand since being on Cymbalta. Plaintiff's concerns were also previously documented in progress notes dated June 23, 2023, and dated June 30, 2023.

81.     After Plaintiff's transfer to SRCI (Snake River Correctional Institution) his provider changed to Defendant Clements, who reportedly told Plaintiff that Dr. Walker's instructions did not have to be followed and accused Plaintiff of being a drug addict.

82.     On or about September 25, 2023, Plaintiff grieved Defendant Clements and TLC. Plaintiff's grievance stated that Defendant Clements was not adhering to the recommendations of Dr. Walker. The grievance was denied for "non-compliance with DOC rule #109."

83.     On information and belief any recommendations by Dr. Walker were ignored during Plaintiff's time at SRCI by Defendant Clements.

84.     Plaintiff was transferred to OSP and submitted a Non-Emergency Healthcare Request to explain that Defendant Davies had been working with Dr. Walker but that Defendant Clements had stopped the process. That same day, a nurse by the initials of "B.C." noted, "provider visit for pain specialist appt. scheduled. Scheduled sick call."

85.     On or about December 1, 2023, Plaintiff stated that the cortisone shot for his right shoulder was not providing relief like it used to.

86.     On or about December 22, 2023, TLC approved physical therapy for Plaintiff's shoulder, including the diagnosis "right shoulder impingement, decreased ROM (limited range of motion), developed OA (osteoarthritis) at glenohumeral joint.

87.     On or about January 10, 2024, TLC denied an orthopedic consult. The reason provided for the denial was "not medically indicated at this time." Instead, TLC recommended Plaintiff finish physical therapy. However, Plaintiff had not even started physical therapy because defendants had not provided it.

88.     On or about January 16, 2024, Plaintiff reported that he had not begun physical therapy despite it being approved for two months. Plaintiff once again emphasized that he was "in so much pain."

89.     On or about April 14, 2024, a note in Provider's Returning Information stated that Plaintiff "reports persistent pain, not sleeping well at night due to pain. Good compliance w. HEP." Recommendations included continuing HEP and two more physical therapy sessions. In a response dated April 19, 2024, it was noted that there was a pending MRI and "ortho consult."

90.     On or about May 15, 2024, a note in Provider's Returning Information stated, "PT reports no change in pain overall. States he was approved for MRI and ortho consult and still having lots of pain at night. Currently 1/10 pain but still 10/10 every night." Once again Plaintiff's "good compliance with HEP" was noted.

91.     In a health services test results communication dated June 12, 2024, the MRI on Plaintiff's right shoulder revealed a "full-thickness tear of the supraspinatus tendon measuring 3.1cm transverse with 2.5cm of retraction" along with "mild glenohumeral joint osteoarthritis." The communication's comments/instructions section included a note about a "pending ortho appt."

92.     On or about September 14, 2024, Plaintiff submitted a Non-Emergency Healthcare Request inquiring as to when the ortho consult would occur. The response stated the appointment was scheduled for September 27, 2024, but upon information and belief Plaintiff did not have an orthopedic appointment until on or about October 14, 2024.

93.     The orthopedic appointment confirmed a untreated tear in Plaintiff's rotator cuff in his right shoulder. Upon information and belief, the tear had retracted due to significant delay

in medical treatment. Plaintiff's shoulder may be irreparably damaged and ineligible for surgery because of the resulting retraction.

94.    Upon information and belief, Defendant Roberts is responsible for reviewing medical care and medical decisions by his subordinate medical staff throughout ODOC when individuals in custody file appeals to denied medical grievances.

95.    Upon information and belief, Defendant Bugher is responsible for reviewing medical care and medical decisions by Health Services staff throughout ODOC when individuals in custody file second appeals to denied medical grievances.

96.    Upon information and belief, Defendant Roberts is head of the TLC Committee and has final authority on all decisions presented to the TLC Committee.

97.    Upon information and belief, Defendant Roberts is responsible for training and supervising all subordinate medical staff and ensuring proper medical care for all adults in ODOC custody.

98.    Upon information and belief, Defendant Bugher is responsible for training and supervising all subordinate Health Services staff and ensuring proper care for all adults in ODOC custody.

99.    Upon information and belief, Defendant Fheure is responsible for training, supervision, and oversight of all employees at OSP and ensuring that adults in OSP's care, custody, and control are treated lawfully and humanely at all times.

100.    Upon information and belief, Defendant Miller is responsible for training, supervision, and oversight of all employees at SRCI and ensuring that adults in SRCI's care, custody, and control are treated lawfully and humanely at all times.

101.     Upon information and belief, Defendant Pedro is responsible for training, supervision, and oversight of all employees at EOCI and ensuring that adults in EOCI's care, custody, and control are treated lawfully and humanely at all times.

## COUNT I

**(42 U.S.C. §1983 – Eighth Amendment – Delay and Denial of Essential Medical Care)**
**(Against Defendants ODOC, Roberts, Bugher, Clements, Davies, Fhuere, Pedro and Miller)**

102.     Plaintiff realleges all previous paragraphs as if more fully set forth herein.

103.     Plaintiff is entitled to timely and adequate medical care as part of his Constitutionally guaranteed conditions of confinement pursuant to the Eighth Amendment to the United States Constitution. Failure to provide timely and adequate medical care is a violation of the Eighth Amendment prohibitions against cruel and unusual punishment.

104.     Plaintiff was denied timely, adequate, and proper medical care when Defendants failed to address his chronic pain in a timely manner.

105.     Plaintiff was denied timely, adequate, and proper medical care when Defendants failed to respond to his health concerns that were consistently communicated to the appropriate staff and through the appropriate channels via kytes and grievances.

106.     Plaintiff was denied timely, adequate, and proper medical care when Defendants misrepresented and omitted important facts about Plaintiff's health history to the pain specialist.

107.     Plaintiff was denied timely, adequate, and proper medical care when Defendants denied any opportunity for Plaintiff to correct the mistakes about his health history by speaking to the pain specialist directly.

108.     Plaintiff was denied timely, adequate, and proper medical care when Defendants ignored the recommendations of the pain specialist.

109.    Plaintiff was denied timely, adequate, and proper medical care when Defendants prescribed medications proven to have harmful side effects for Plaintiff.

110.    Plaintiff was denied timely, adequate, and proper medical care when Defendants prescribed medications proven to be ineffective for managing Plaintiff's pain.

111.    Plaintiff was denied timely, adequate, and proper medical care when Defendants did not identify the severity of his right shoulder pain from a torn and now retracted rotator cuff.

112.    Plaintiff was denied timely, adequate, and proper medical care when Defendants ignored the recommendations of an orthopedic specialist and refused to provide debridement surgery for his right knee, a medical condition that continues to cause pain and swelling to this day.

113.    Plaintiff was denied timely, adequate, and proper medical care when Defendants repeatedly denied Plaintiff access to proper medical care during TLC Committee meetings.

114.    Plaintiff was denied timely, adequate, and proper medical care when Defendants filed to properly address Plaintiff's grievances and appeals, and simply "rubber stamped" denials on his grievance appeals.

115.    Defendants' actions have contributed to worsening of Plaintiff's condition and caused possibly irreversible harm.

116.    The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

117.    Plaintiff is entitled to damages to compensate him for these injuries.

118.    Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

119.    Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT II

### (42 U.S.C. §1983 – Eighth Amendment – Failure to Adequately Train & Supervise Subordinate Staff)
### (Against Defendants Roberts, Bugher, Fhuere, Pedro and Miller)

120.    Plaintiff re-alleges all prior paragraphs as though fully restated herein.

121.    The knowing and willful acts and omissions of Defendants, Roberts, Bugher, Fhuere, Pedro, and Miller alleged herein constitute deliberate indifference to the substantial risk of serious harm to Plaintiff as a result of inadequate and delayed medical care in violation of the Eighth and Fourteenth Amendments to the United States Constitution, by failing to properly and adequately train and supervise subordinate employees, and tacitly allowing denial and delay of necessary medical care.

122.    The individually named defendants acted with deliberate indifference to Plaintiff's constitutional rights. As a result of defendants' conduct, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress.

123.    Plaintiff is entitled to damages to compensate him for these injuries.

124.    Defendants' acts were willful and malicious and done with reckless indifference to Plaintiff's protected rights. Defendants should be assessed punitive damages in an amount as fixed by a jury to punish them and to deter such conduct in the future.

125.    Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

/ / /

## COUNT III

**(Negligence)**
**(Against ODOC)**

126.    Plaintiff re-alleges all previous relevant paragraphs as if fully stated herein.

127.    Defendants knew or should have known that Plaintiff's persistent chronic pain required medical intervention and that Plaintiff's condition was worsening with time.

128.    Defendants knew or should have known the significant risks to Plaintiff's health by failing to provide adequate pain management for Plaintiff's proven neurological pain from Plaintiff's brachial plexopathy injury and ulnar nerve neuropathy.

129.    Defendants knew or should have known the significant risks to Plaintiff's health by failing to provide adequate pain management for Plaintiff's cervical degenerative disc disease.

130.    Defendants knew or should have known that physiatrists require an accurate and thorough health history to make proper recommendations.

131.    Defendants knew or should have known that ignoring the physiatrist's recommendations would be a significant risk to Plaintiff's health.

132.    Defendants knew or should have known that Plaintiff's untreated bony avulsions in his right knee posed a significant risk to Plaintiff's health.

133.    Defendants knew or should have known that Plaintiff's untreated rotator cuff in his right shoulder posed a significant risk to Plaintiff's health.

134.    Defendants knew or should have known that Plaintiff's health history put him at risk of continued pain and health complications without proper and timely diagnostics, follow-up, pain medication, and surgical intervention. Failure to do so put Plaintiff at risk of additional pain and suffering.

135.    Plaintiff has suffered physical harm and severe physical and mental pain and suffering.

136.    ODOC failed to use reasonable care in documenting Plaintiff's condition and to ensure adherence by all staff, and to ensure that Plaintiff received proper and timely medical care while in ODOC custody. ODOC's conduct was negligent.

137.    Defendant ODOC owes plaintiff a higher standard of care because of the nature of incarceration. As wards of the State, Defendant ODOC manages all aspects of Plaintiff's daily life and decides with whom he will interact, where he will work, live, sleep, bathe, use the toilet, recreate, etc. Had Plaintiff been a free person, he would have been able to seek out timely medical care, but defendant ODOC prevented Plaintiff from being able to take those measures.

138.    Defendant ODOC voluntarily took the custody of Plaintiff under circumstances such as to deprive him of normal opportunities for protection and created a non-delegable duty to ensure that Plaintiff was provided necessary and timely medical care, including adherence to specialist recommendations, pain management, and timely diagnostics, follow-up, and treatment. Defendants have repeatedly failed to meet their obligation to protect Plaintiff from known, obvious, and predictable risk of re-injury, ongoing pain and suffering, and additional damage from lack of treatment.

139.    ODOC's conduct was and is unreasonable in light of the risk of harm to Plaintiff. ODOC controlled all aspects of Plaintiff's life. Plaintiff's harms could have easily been prevented if Defendants properly followed Plaintiff's surgical aftercare needs and ensured adherence, and if defendants provided timely and proper access to outside medical diagnostics and treatment. This was unreasonable.

140.     As a direct and proximate result of ODOC's negligence, Plaintiff suffered economic harm, physical pain, injuries, and emotional distress. Plaintiff should be fully and fairly compensated for his damages in a sum that is determined by a jury.

## PRAYER FOR RELIEF

a.  A sum which will fully compensate Plaintiff for his physical pain and suffering;

b.  A sum which will compensate plaintiff for his emotional distress;

c.  A sum which will fully compensate plaintiff for his economic losses;

d.  An award of punitive damages;

e.  For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

f.  Equitable relief; and

g.  For such other and further relief as the Court may deem just and equitable.

Plaintiff demands trial by Jury.

Dated: 1 November 2024

LAW OFFICE OF KATHARINE EDWARDS

s/ Katharine Edwards
Katharine Edwards, OSB No. 173393
attorney@kedwards-law.com
P.O. Box 417
Hillsboro, Oregon 97123
Telephone: (503) 908-3589
Attorney for Plaintiff